# IN THE COURT OF APPEALS OF THE STATE OF MISSISSIPPI

## NO. 2019-CA-01213-COA

**TRAVIS FLOYD, INDIVIDUALLY AND AS GRANDFATHER AND NEXT FRIEND OF BRANAE NICOLE FLOYD, A MINOR, WRONGFUL DEATH BENEFICIARY OF BRANDI NICOLE FLOYD AND THE UNBORN CHILD OF BRANDI NICOLE FLOYD**  **APPELLANT**

**v.**

**TUNICA COUNTY, MISSISSIPPI AND TUNICA COUNTY SHERIFF'S DEPARTMENT**  **APPELLEES**

| | |
|---|---|
| DATE OF JUDGMENT: | 06/24/2019 |
| TRIAL JUDGE: | HON. LINDA F. COLEMAN |
| COURT FROM WHICH APPEALED: | TUNICA COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANT: | JOHN KEVIN CAVENDER |
| | GEORGE CHADWICK REEVES |
| ATTORNEYS FOR APPELLEES: | DANIEL JUDSON GRIFFITH |
| | ARNOLD URSUA LUCIANO |
| | BETHANY ANN TARPLEY |
| NATURE OF THE CASE: | CIVIL - WRONGFUL DEATH |
| DISPOSITION: | AFFIRMED - 01/11/2022 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE WILSON, P.J., McDONALD AND EMFINGER, JJ.**

**WILSON, P.J., FOR THE COURT:**

¶1. Nathaniel Yates violently attacked his pregnant girlfriend, Brandi Floyd, at a hotel room at the Hollywood Casino in Robinsonville. Tunica County sheriff's deputies, who responded to a call for help from the casino, attempted to subdue Yates with a taser, but they were unable to prevent Yates from killing Floyd and her unborn child. Floyd's father filed a wrongful death suit against Tunica County, alleging that the deputies acted in reckless

disregard of the safety and well-being of Floyd and her unborn child. The case proceeded to a bench trial, and at the close of the plaintiff's case-in-chief, the trial judge dismissed the case pursuant to Mississippi Rule of Civil Procedure 41(b). The trial judge found that the deputies owed no legal duty to Floyd or her unborn child; that the deputies were entitled to police-protection immunity under the Mississippi Tort Claims Act (MTCA), Miss. Code Ann. § 11-46-9(1)(c) (Rev. 2012); and that the deputies were entitled to discretionary-function immunity under the MTCA, *id.* § 11-46-9(1)(d). On appeal, Floyd's father challenges the trial judge's ruling on all three grounds. We affirm the judgment based on the trial judge's finding that the deputies were entitled to police-protection immunity. We do not address and express no opinion on the alternative grounds for the trial judge's ruling.

**FACTS AND PROCEDURAL HISTORY**

¶2.     On April 5, 2012, Tanya Ballard was working the 11 p.m. to 7 a.m. shift at the front desk of the Hollywood Casino in Robinsonville. At some point during her shift, a man approached the front desk and reported that he had heard the sound of someone crying coming from Room 139. Ballard relayed this information to casino security, and security officers went to check on Room 139. Before the security officers returned, Ballard received a call from Room 139. The woman on the phone, later identified as Floyd, told Ballard that she "needed some help." When the security officers returned to the front desk, they told Ballard that they did not hear any noise from the room. Ballard told them about the call she had received. Ballard stated that the room appeared to be registered to an "older person," so she and the security officers thought that the caller might have fallen and needed help.

2

¶3.    Shortly thereafter, Floyd called the front desk again. Floyd stated that she "needed some help" and "couldn't get the door open," and she authorized hotel security officers to open the door to the room; however, Ballard testified that Floyd never said that she needed someone to "come in [her room] and . . . save [her] or anything like that." Security officers stated that they could not get into Floyd's room, and then Floyd told Ballard that "she couldn't get him off of her." At that point, it became "apparent" to Ballard "that something else was going on besides just a slip and fall." Ballard asked Floyd whether there were any weapons in the room, and Floyd said, "No." According to Ballard, Floyd sounded "tired," but she did not seem to be hurt, in pain, or intoxicated. In addition, Ballard never heard any sounds of conflict or a male voice in the room.

¶4.    Eric Brown worked as a security officer for Hollywood Casino at the time. Around 6 a.m., he received information about an argument in Room 139. Brown and his supervisor went to Room 139, knocked on the door, and identified themselves as security. They received no response. Brown went to the front desk to find out to whom the room was registered. Brown then returned to Room 139 and knocked again, still receiving no answer. Brown returned to the front desk and tried calling Room 139, but no one answered the phone. Brown testified that he started "getting suspicious," so he asked the casino's security dispatch to call the sheriff's department.

¶5.    While he waited for law enforcement to arrive, Brown stood near a window that looked into Room 139. He could see through a small opening in the curtain that was only a "few inches" wide. He saw a woman sitting on the bed wearing a bra but no shirt and

3

talking on the telephone. When she stood up, Brown saw some "little small" red "specks" on the bed. He assumed that the specks were blood, although he did not see any injuries on the woman's body at the time. Then a man came to the window and opened the curtains wide, so Brown moved back quickly to avoid being seen. Brown did not know a man was in the room until that moment.

¶6. Sheriff's deputies arrived "within minutes," and Brown told them that there was an ongoing incident in Room 139. He told them what he had seen, and the deputies told him to stand back. Brown watched as the deputies knocked on the door and then tried without success to use a key to open the door. Brown testified that the doors to the hotel rooms could not be opened with a key if the deadbolt was in place. While the deputies discussed what to do next, Brown heard glass breaking. He told the deputies that someone had broken the window, and the deputies ran to the front of the hotel.

¶7. Deputy Dornae Mosby was near the end of his shift when he responded to a call from dispatch about a disturbance at the casino. He did not have a partner with him, but he was carrying a .40-caliber handgun, pepper spray, and a taser. Mosby parked near the front of the casino, which was the reported area of the disturbance. The dashcam of his patrol car was on and captured video of the ensuing events.

¶8. Mosby exited his patrol car and walked to the window of Room 139. He looked inside but saw nothing. He then made contact with casino security officers, who told him about the calls the casino had received from the room and that there had been loud noises and disturbances heard in the room. Mosby and casino security proceeded to Room 139, where

4

Mosby knocked on the door and announced himself as law enforcement. There was no response, so he knocked again. Mosby testified that he heard someone say, "Hold on." Mosby knocked a third time, and this time, he heard a man say that everything was "fine." Mosby knocked a fourth time, and this time, someone in Room 139 opened the door for a second and then slammed it shut.

¶9.   Mosby testified that although casino security officers provided a key card that he used to open the primary lock on the door, a secondary lock or latch prevented him from opening the door more than about two inches, and someone inside the room slammed the door shut again. At that point, Mosby drew his handgun. Shortly thereafter, Mosby heard glass break, and he and Deputy Arthur Griham ran to the front of the casino. Mosby testified that he never attempted to open the door to the room by forcefully breaking the door latch.

¶10.   When they reached the front of the casino, Mosby and Griham saw that Yates had broken through the window and was now outside the hotel. When Yates saw the deputies, he jumped back through the window into Room 139. Mosby drew his taser and announced, "Taser, taser, taser." He then told Yates to "get down," but Yates refused. Mosby testified at trial that he was about twelve feet away from the window, although at his deposition he had testified that he was only about five feet away from the window. Mosby then used his taser on Yates, who was still inside the hotel room. But Yates pulled the taser prongs out and said, "This all the f*** you got?" Mosby then used his taser on Yates again, but Yates again pulled the prongs out and said, "This all the f*** you got?" Mosby testified that he could see inside Room 139 from where he was standing, but "the only thing [he] saw" was a "chair

turned to the side."

¶11. In his deposition, parts of which Mosby read into the record at trial, Mosby testified that he could see significantly more. In his deposition, Mosby testified that when he looked into the room, he saw Floyd lying on the floor with her head against a dresser. He could also see that her legs were moving. Mosby said that he saw Yates get on top of Floyd until her legs stopped moving. He then saw Yates pick up Floyd, hit and punch her, and then throw her down. Yates then ran toward the window. Mosby testified that he first used his taser on Yates when Yates ran toward the window. After reading from his deposition, Mosby acknowledged that after he tased Yates, he also heard Floyd scream more than once, "Help me. He's going to kill me." After he was unable to subdue Yates with his taser, Mosby believed that Floyd's life was in danger.

¶12. Because Mosby had used both of his taser cartridges, he moved away from the window and attempted to tell other deputies what was occurring inside the room. About five minutes after Mosby had tased him, Yates jumped out of the window again. Two other deputies who had arrived at the scene tased Yates at that point and finally subdued him.

¶13. Mosby testified that neither he nor any other officer drew their service weapons outside the casino. Mosby testified that after he was unable to subdue Yates with his taser, he considered Yates an imminent threat to Floyd and believed that Floyd's life was in danger. However, Mosby testified that he did not attempt to shoot Yates at that time because he believed that casino security personnel were in the hallway outside the room and that other hotel guests were in an adjacent room. Mosby was concerned that if he missed, the bullet

6

could have gone through a door or wall and hit someone else.

¶14.    Deputy Griham testified that when he arrived at the casino, he parked behind Mosby's patrol car and found Mosby inside at the door to Room 139.  Mosby knocked on the door and announced their presence.  Griham heard someone inside say "hold on" or "wait."  Griham testified that after Mosby knocked again, they heard someone inside the room screaming.  Although they tried to use a master key to unlock the door, the latch inside the door prevented them from opening it, and someone inside slammed it shut.  They then heard someone yell for help and heard a "tussle" in the room.  Griham testified that Mosby then tried to kick the door in, and the screaming "escalated."  Mosby and Griham then heard glass breaking and ran outside to the front of the casino.

¶15.    Griham saw Yates walking around outside the building.  He appeared to have blood on him.  Griham testified that he could not have tased Yates because he was not taser-qualified and did not have a taser.  He did have mace and a .40-caliber handgun.  Griham, who was standing several feet away, saw Yates jump back inside the hotel room and then saw Mosby use his taser on Yates.

¶16.    Griham testified that at some point in the melee, he saw Yates pick Floyd up and hit her.  Yates said he was "going to kill this b****."  This was after Mosby had tased Yates.  Neither Mosby nor Griham tried to get into the room again.  They did not see any weapons on Yates at the time.  Yates never directly threatened the officers, only Floyd.  Griham testified that he believed Floyd's life was in danger at this point.

¶17.    Griham testified that it would not have been reasonable for him to shoot into the hotel

7

room because the curtains were drawn, and he could not see what was occurring in the room. He also said that it would not have been reasonable for him to walk up to the window without knowing what Yates was doing in the room and whether Yates was armed.

¶18. Deputy Pedro Bee testified that as he was driving up to the casino, he could see Yates through the window, hitting something with a chair. Mosby and Griham informed Bee and other deputies that Yates had jumped through the window of Room 139 before jumping back inside and that Mosby had tased him. Bee testified that he stood about twenty-five to thirty feet from the window of Room 139. Bee told Mosby that he had seen Yates hit something with a chair, and Mosby said that Yates had been assaulting a woman. Bee testified that he had been trained that he could use deadly force to stop a threat to himself or others.

¶19. When Yates jumped out the window again, Bee saw Deputy Eric Thaddies tase him. Bee ran to assist and also deployed his taser. Together, they were finally able to subdue Yates. Bee said that as Yates was being handcuffed, he stated, "I love that b****." Bee thought he was on the scene for about four minutes before Yates was subdued. He said he and the other officers were in constant communication with each other and dispatch, trying to assess the situation and decide what to do. Bee testified that a bullet from a .40-caliber handgun could go through "a couple of walls."

¶20. Deputy Eric Thaddies testified that he arrived at the casino just after Bee. He saw the glass on the ground outside the window of Room 139, and other deputies told him that there was a man in a room threatening to hurt himself or anyone who entered the room. Thaddies testified that he was told that there was "possibly" someone else in the room too. Thaddies

said he could not see into the room through the broken window, but Griham reported that he thought Yates was using a chair as a weapon. Thaddies thought that he saw Yates banging the chair on the floor. Thaddies did not see any of the deputies standing close to the window. Thaddies said he was at the casino for maybe two to three minutes before he and Bee tased and subdued Yates.

¶21. Michael Lyman testified for the plaintiff as an expert in police practices and procedures and the use of force. Lyman said that based on his reading of the depositions and reports, three calls were made from Room 139 to the front desk, each indicating that Floyd could not leave the room and was in danger. Lyman said that the information Mosby and Griham had when they responded to Room 139 would require a "heightened level of vigilance" because domestic violence situations "are unpredictable [and] fluid." Lyman opined that Mosby and Griham understood the gravity of the situation after they were unable to get into the room and heard a scuffle inside the room. He said that Mosby and Griham acted reasonably to the point of hearing Yates break through the window.

¶22. Lyman testified that a taser is on the lower end of the scale for use of force for law enforcement and that it is viewed at the same level as mace spray. Lyman said that tasers should be used on people not willing to be taken into custody and those who need to be restrained for safety.

¶23. Lyman testified that Mosby's decision to use a taser was inappropriate. Lyman testified that by that point, Mosby "had every reason to believe that there was a violent crime in progress and that somebody was at risk of death or serious[] bodily injury." Lyman

9

disagreed with the deputies' testimony that they could not use their guns because they might have endangered guests of the hotel or hotel security personnel.

¶24. Lyman said that Mosby was close enough to the window and close enough to Yates to use his gun and hit the target (i.e., Yates). Lyman said that Mosby should have used his gun on Yates after the taser failed to subdue him. Lyman said that the situation continued to escalate to "level 5"—the highest level under the Tunica County Sheriff's Department's Policies and Procedures. The Policies define a level-five situation as one involving a "serious threat of bodily harm or death." Lyman testified that the Department's Policies were consistent with national standards. Lyman asserted that there was "no legitimate law enforcement purpose for officers to allow a violent crime in progress to keep on progressing while standing idly by, knowing full well what is going on inside that room."

¶25. Lyman acknowledged that an officer must consider the totality of the circumstances before deciding to use deadly force. But he testified that given the circumstances in this case—including Yates's escalating threats and violence and the taser's ineffectiveness—the deputies should have used deadly force.

¶26. Lyman acknowledged that the officers did not know whether Yates was armed. However, he testified that regardless of whether Yates was armed, a "reasonable officer" should have predicted "continued violence against . . . Floyd" in light of Yates's threats and Floyd's pleas for help. He asserted that officers must make "reasonable" judgment calls regarding the use of deadly force and that the deputies in this case "were reckless in not stopping . . . Yates from proceeding with a violent crime that they knew full well was under

way." Lyman acknowledged that no policy *required* the deputies to use deadly force in a level-five situation; rather, the applicable policy provided that deadly force was a permissible option under the circumstances.

¶27.    After Yates was subdued and arrested, deputies entered Room 139. Floyd was dead. She had been stabbed repeatedly and beaten, and her face was badly mutilated. There was blood "all over" the room and bathroom, and the carpet was saturated with blood.

¶28.    The dashcam from Mosby's patrol car captured the scene outside the casino, directly in front of the window to Room 139. At trial, this video was played alongside security video from the casino that showed the hallway outside Room 139. Based on the timestamps from the videos,[1] this is a rough timeline of the events that morning:

> 6:01:34:    Mosby arrives at the casino.
>
> 6:02:17:    Mosby approaches the window of Room 139 and tries to look inside.
>
> 6:02:34:    Mosby enters hotel lobby, speaks to casino security, and watches Room 139 through the lobby door.
>
> 6:03:07:    Griham enters the casino, and he and Mosby walk to Room 139.
>
> 6:03:22:    Mosby and Griham arrive outside the door to Room 139.
>
> 6:03:37:    Mosby and Griham draw their firearms and point them at the door to Room 139.
>
> 6:03:43:    Brown runs across hotel lobby away from Room 139.
>
> 6:03:45:    Griham and Mosby talk on the radio and continue watching the

---

[1] The timestamp on the dashcam video is incorrect, but testimony at trial indicates that the timestamps on the casino security videos are accurate. Therefore, we use the timestamp from the casino security videos.

door to Room 139.

6:04:48:       Brown walks back through hotel lobby toward Room 139.

6:05:00:       The window to Room 139 breaks, and Mosby and Griham run through the lobby and out the front door.

6:05:03:       Yates starts to flee but then turns back to Room 139.

6:05:10:       Yates jumps back into Room 139 as the lobby doors open and Mosby and Griham exit the hotel.

6:05:17:       Mosby approaches the window with his taser drawn.

6:05:25:       Mosby deploys his taser through the window.

6:05:35:       Hotel security officers can be seen in the lobby, trying to direct guests away from the area.

6:05:43:       Mosby deploys his taser through the window a second time.

6:05:48:       Mosby backs away from window, with his hand on the holster of his gun.

6:05:53:       Yates can be seen through the window of Room 139 as Mosby backs away.

6:06:04:       Mosby drops the spent taser and moves out of frame.  Security and law enforcement officers can be seen in the hotel lobby.

6:07:07:       An unidentified woman can be seen approaching Room 139 in the hallway. She appears to stop and listen at the door.

6:07:14:       Movement can be seen through the window in Room 139.

6:07:57:       Mosby approaches the window and stops to retrieve his taser.

6:08:03:       A person can be seen through the window of Room 139.

6:08:08:       A guest attempts to cross the hotel lobby.

6:08:10:       Officers can be seen in the lobby and immediately outside hotel

doors.

6:08:40:     Mosby approaches the window, hand on his holster, directing other officers.

6:08:53:     Mosby moves closer to the window, watching Room 139.

6:08:58:     Mosby backs away and out of view.

6:09:45:     Someone is visible inside Room 139 while Bee watches from the lobby door.

6:10:33:     Bee begins backing away from the lobby door as Yates prepares to leap from the window.

6:10:35:     Yates jumps out of the window a second time and rolls on the ground.

6:10:43:     Bee and Thaddies rush toward Yates and use their tasers to subdue him with their tasers.

¶29.   Floyd's father, as a wrongful death beneficiary and on behalf of Floyd's minor child, sued Tunica County and Hollywood Casino in the Tunica County Circuit Court.[2]  The complaint alleged that Tunica County Sheriff's Department had acted with reckless disregard and conscious indifference to the safety and well-being of Floyd and her unborn child.[3]  The County answered and denied liability.

¶30.   Prior to trial, the County moved for summary judgment.  The County argued that it owed no duty to Floyd at the time of her death, that it was immune from liability under the police-protection exemption of the MTCA, Miss. Code Ann. § 11-46-9(1)(c); that it was immune from liability under the discretionary-function exemption of the MTCA, *id.* § 11-46-

_____

[2] Hollywood Casino was later dismissed pursuant to a settlement.

[3] Floyd was approximately five months pregnant at the time of her death.

13

9(1)(d); and that the deputies' actions or inactions were not the proximate cause of Floyd's death. The circuit court denied the County's motion for summary judgment.

¶31. The case proceeded to a bench trial. When Floyd's father rested his case after three days of testimony, the County moved for an involuntary dismissal under Rule 41(b) of the Mississippi Rules of Civil Procedure on the same grounds asserted in its earlier motion for summary judgment. The trial judge granted the County's motion, finding that the County did not owe a "cognizable legal duty" to Floyd under the "Public Duty Doctrine"[4] and that the County was immune from liability under both the police-protection exemption and the discretionary-function exemption. Floyd's father filed a notice of appeal. On appeal, he argues that the trial judge erred in dismissing the case on each ground.

¶32. We affirm the trial judge's ruling to the extent that it is based on the police-protection exemption, Miss. Code Ann. § 11-46-9(1)(c), because there is substantial evidence to support the trial judge's finding that the deputies did not act in reckless disregard of the safety and well-being of Floyd and her unborn child. Because the police-protection exemption applies, it is unnecessary to address the alternative grounds for the trial judge's ruling.[5]

---

[4] In *Gant v. Maness*, 786 So. 2d 401 (Miss. 2001), the Court held that a sheriff cannot be held liable for an alleged breach of a "duty owed to the public as a whole." *Id.* at 405-06 (¶¶15-16) (citing *Robinson v. Est. of Williams*, 721 F. Supp. 806, 808 (S.D. Miss. 1989)). The Court stated that a plaintiff must show that the sheriff owed him or her a more direct duty distinct from the duties the sheriff owes to the public as a whole. *Id.* In *Dean v. Walker*, 743 F. Supp. 2d 605 (S.D. Miss. 2010), the court noted that no Mississippi case has specifically addressed the question whether the MTCA and its "reckless disregard" standard supersedes or subsumes the "public duty doctrine" as a limitation on liability. *Id.* at 607. As stated previously, it is unnecessary for us to address the issue in this case.

[5] *See MacDonald ex rel. MacDonald v. Miss. Dep't of Transp.*, 955 So. 2d 355, 360 (¶20) (Miss. Ct. App. 2006) ("[W]here one exemption listed at [s]ection 11-46-9(1) applies,

14

**ANALYSIS**

¶33. The MTCA provides that a governmental entity shall be immune from liability for

> any claim . . . [a]rising out of any act or omission of an employee . . . engaged in the performance or execution of duties or activities relating to police . . . protection unless the employee acted in reckless disregard of the safety and well-being of any person not engaged in criminal activity at the time of injury.

Miss. Code Ann. § 11-46-9(1)(c). In the present case, after the plaintiff's case-in-chief, the trial judge found that the County was immune from liability under this provision because the plaintiff failed to meet his burden of proving that the deputies involved acted in reckless disregard of the safety and well-being of Floyd and her unborn child.

¶34. In an appeal from a judgment entered following a bench trial, a circuit judge "is afforded the same deference as a chancellor." *Miss. Dep't of Wildlife, Fisheries, & Parks v. Webb*, 248 So. 3d 772, 776 (¶4) (Miss. 2018) (quoting *City of Jackson v. Lewis*, 153 So. 3d 689, 693 (¶4) (Miss. 2014)). We will not disturb the trial judge's findings unless they are "manifestly wrong" or "clearly erroneous" or the trial judge applied an "erroneous legal standard." *Id.* (quoting *Lewis*, 153 So. 3d at 693 (¶4)). The trial judge's findings must be affirmed when "they are supported by substantial, credible, and reasonable evidence." *Id.* at 776 (¶4) (quoting *Lewis*, 153 So. 3d at 693 (¶4)). "Although reasonable minds might differ on the conclusion of whether or not the officer in question acted in reckless disregard, it is beyond this Court's power to disturb the findings of the trial judge if supported by substantial evidence." *Id.* at 777 (¶4) (quoting *Lewis*, 153 So. 3d at 693 (¶4)).

---

no further immunity is necessary, as that immunity in and of itself is sufficient to defeat a claim.").

15

¶35.    In a bench trial, after the plaintiff "has completed the presentation of his evidence, the defendant . . . may move for a dismissal on the ground that upon the facts and the law the plaintiff has shown no right to relief." M.R.C.P. 41(b). "A motion for involuntary dismissal under Rule 41(b) is different from a motion for a directed verdict, which is made only in a jury trial." *Lewis v. Lewis*, 269 So. 3d 230, 235 (¶13) (Miss. Ct. App. 2018). "This distinction must be understood, because the standard of review for a dismissal is different than that for a directed verdict." *Ladner v. Stone County*, 938 So. 2d 270, 273 (¶9) (Miss. Ct. App. 2006).

¶36.    In ruling on a Rule 41(b) motion to dismiss, "[t]he judge must consider the evidence fairly, rather than in the light most favorable to the plaintiff," as would be the case on a motion for a directed verdict or a motion for summary judgment. *Century 21 Deep S. Props. Ltd. v. Corson*, 612 So. 2d 359, 369 (Miss. 1992). That is, the trial judge should give the plaintiff's evidence only "such weight and credibility as [the judge] would ascribe to it if he were making findings of fact and rendering final judgment." *Gray v. Alumax Extrusions Inc.*, 477 So. 2d 1355, 1356-57 (Miss. 1985). If the judge "would find for the defendant" on the evidence presented, "the case should be dismissed." *Corson*, 612 So. 2d at 369. "[T]he motion should be granted if the plaintiff has failed to prove one or more essential elements of his claim or if the quality of the proof offered is insufficient to sustain the plaintiff's burden of proof." *Buelow v. Glidewell*, 757 So. 2d 216, 220 (¶12) (Miss. 2000). "The court must deny a motion to dismiss only if the judge would be obliged to find for the plaintiff if the plaintiff's evidence were all the evidence offered in the case." *Corson*, 612 So. 2d at 369.

¶37.    To prevail on his claim against the County, Floyd's father was required to prove by a preponderance of the evidence that the County, through its deputies, acted in reckless disregard of the safety of Floyd and her unborn child. *City of Laurel v. Williams*, 21 So. 3d 1170, 1174 (¶17) (Miss. 2009).  "Reckless disregard is a higher standard than gross negligence and embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act." *City of Vicksburg v. Williams*, 294 So. 3d 599, 601-02 (¶15) (Miss. 2020) (brackets and quotation marks omitted).  Reckless disregard involves "not only some appreciation of the unreasonable risk involved, but also a deliberate disregard of that risk and the high probability of harm involved." *Id.* at 601 (¶15) (quoting *Miss. Dep't of Pub. Safety v. Durn*, 861 So. 2d 990, 994 (¶13) (Miss. 2003)).  "It typically involves a conscious indifference to consequences, and almost a willingness that harm should follow." *Hinds County v. Burton*, 187 So. 3d 1016, 1022 (¶17) (Miss. 2016) (quoting *City of Jackson v. Shavers*, 97 So. 3d 686, 688 (¶8) (Miss. 2012)).  "In addition, the nature of the officers' actions is judged on an objective standard with all the factors that they were confronted with." *Williams*, 21 So. 3d at 1175 (¶17) (quotation marks omitted).

¶38.    In *Williams*, the Supreme Court held that police officers did not act with reckless disregard when they declined to arrest a person accused of domestic violence. *Williams*, 21 So. 3d at 1176 (¶24).  In that case, police officers were sent to Lisa Williams's home around 8:30 p.m. based on a report of an alleged domestic dispute. *Id.* at 1172 (¶2).  Williams's boyfriend, Kenneth Wilson, "admitted [to the officers] that he and Williams had gotten into a 'tussle,' and that Williams had hit him in the head." *Id.* at 1173 (¶3).  The officers told

17

Wilson and Williams that they had probable cause to arrest both of them, but neither Wilson nor Williams wanted to press charges. *Id.* at (¶5). Williams did tell the officers that she wanted Wilson to leave her home, and Wilson said that he would go to the home of Williams's mother, Annie Walker, where he sometimes stayed when he and Williams had gotten into a fight. *Id.* at (¶¶5-6). The officers remained at Williams's residence until Wilson left. *Id.* at (¶6). Around 10 p.m., the officers responded to an incident at Walker's house. *Id.* at (¶¶8-9). Walker said that Wilson was drunk and angry and that she wanted him to leave, but one of the officers testified that Wilson was calm and cooperative. *Id.* The officers told Wilson that he could either have his parents pick him up or go to jail. *Id.* at (¶10). Wilson's parents picked him up at the police station. *Id.* at 1173-74 (¶11). Around 11:15 p.m., officers were called back to Williams's house because Wilson had returned. *Id.* at 1174 (¶12). Wilson had killed Williams by stabbing her with a knife. *Id.*

¶39. On appeal, the Supreme Court held that the officers did not act in reckless disregard of Williams's safety because they had investigated the alleged violence, they saw no evidence that Williams was in fear of Wilson, and Williams did not ask them to arrest Wilson. *Id.* at 1176 (¶22). The Court reasoned that the officers did not act with reckless disregard because they "adequately investigated both incidents, weighed the evidence before them, and made informed decisions regarding the appropriate measures to take." *Id.*

¶40. In another case, Essie Collins sued Tallahatchie County for failing to arrest her estranged husband, Robert, before he shot her. *Collins v. Tallahatchie County*, 876 So. 2d 284, 286 (¶¶1-2) (Miss. 2004). Essie reported to the sheriff's department that she had

18

received threatening phone calls from Robert. *Id.* at 286 (¶2). She also signed a criminal affidavit against Robert for domestic violence, and an arrest warrant was issued. *Id.* at (¶3). However, the warrant was never delivered to the sheriff, and Robert was never arrested. *Id.* Three days later, Robert forced his way into Essie's home, shot her twice, and then killed himself. *Id.* at (¶4). Essie survived and sued the county for failing to arrest Robert prior to the incident. *Id.* at (¶4). The Supreme Court held that although "there was ample probable cause to arrest" Robert prior to the incident, "reckless disregard requires that the [defendant] knowingly or intentionally commit a wrongful act." *Id.* at 288 (¶11). The Court held that Essie could not establish reckless disregard because the sheriff's department's conduct was, at worst, "negligent." *Id.*

¶41.   In *Johnson v. City of Quitman*, 66 So. 3d 1261 (Miss. Ct. App. 2011), this Court addressed the reckless disregard standard in another failure-to-arrest case. Shannon Johnson and her daughter alleged that a city and two of its police officers were liable for injuries they sustained when Johnson's ex-husband, Daniel Nicholson, assaulted them. *Id.* at 1262-63 (¶1). The officers had previously responded to a domestic disturbance call and found Nicholson "in front of Johnson's house threatening harm to Johnson and her family." *Id.* at 1263 (¶3). The officers ordered Nicholson to leave but did not arrest him. *Id.* Three days later, Nicholson returned to Johnson's home and beat and stabbed Johnson and her daughter. *Id.* On appeal, this Court affirmed the circuit court's order granting summary judgment in favor of the city. *Id.* at 1264 (¶8). This Court held that the Johnsons could not show that the officers acted with reckless disregard because there was "no evidence suggesting that the

[o]fficers intended for harm to follow their decision not to arrest Nicholson," nor was there any "evidence that the [o]fficers' conduct was willful or wanton." *Id.*

¶42.    Floyd's father argues that *Williams*, *Collins*, and *Johnson* are distinguishable because the inactions of law enforcement in those cases "occurred either hours or days before" the ultimate violent assault against the victims, whereas the alleged inactions in this case occurred "during the . . . murder." Floyd's father argues that the trial judge in this case erred by granting the County's motion to dismiss because the deputies involved in this case were present during the fatal assault and failed to intervene.

¶43.    However, the deputies testified that they did not simply stand idly by while Floyd was murdered; rather, the deputies took actions they thought were reasonable under the circumstances. Moreover, the videos admitted into evidence corroborate the deputies' testimony. The videos show that Mosby arrived at the casino at 6:01 a.m., and by 6:10 a.m. Yates had been subdued. During those nine minutes, Mosby discussed accessing the hotel room with casino security personnel and attempted to access the room through the door. Mosby then responded to the sound of breaking glass when Yates jumped from the window, ran back outside the casino, and deployed his own taser on Yates twice, albeit unsuccessfully. Mosby then conferred with other deputies about how to proceed. Finally, Thaddies and Bee were able to subdue Yates with their tasers. The deputies testified that during this nine-minute period, they discussed how to proceed and watched Yates's movements as best they could through the broken window. They were reluctant to discharge their handguns into the room because they could not clearly see what was occurring inside the room and because

20

they believed that doing so would pose a threat to casino guests in adjacent rooms or casino employees in the hallway.

¶44. While Floyd's father is correct that the facts and circumstances of prior cases are distinguishable, certain legal principles articulated in those cases are on-point. Under the MTCA, the plaintiff's burden is not merely to show that law enforcement officers could or should have done something different—or even to show that they were negligent. *Collins*, 876 So. 2d at 288 (¶11). Rather, "reckless disregard is a higher standard than [even] gross negligence and embraces willful or wanton conduct which requires knowingly and intentionally doing a thing or wrongful act." *Id.* at 287 (¶8) (quotation marks omitted). In *Williams*, the Supreme Court held that the officers' conduct did not rise to the level of "reckless disregard" because the officers made an adequate investigation, "weighed the evidence before them, and made informed decisions regarding the appropriate measures to take." *Williams*, 21 So. 3d at 1176 (¶22). In the present case, the County presented sufficient evidence for the trial judge to reach the same conclusion. Based on the evidence presented, the trial judge rejected the argument that Mosby was duty-bound to use deadly force after he first used his taser and was unable to subdue Yates. The judge also rejected the argument that the deputies were required to enter or discharge their handguns into the hotel room despite "not really knowing what was" going on inside the room and despite the possible risks to themselves or others. The judge stated that she could not "second[-]guess these officers who [were] on the scene" and could not "overlook the fact that this happened in such a short period of time." The judge found that the deputies and the County were entitled to

21

immunity under the MTCA because the deputies had "exercis[ed] their judgment" "in good faith" in a "short window" of time under difficult circumstances.

¶45.    We affirm the judgment of the trial court because there is substantial evidence to support the trial judge's findings of fact and her ultimate conclusion that the deputies exercised their judgment under difficult circumstances after weighing the evidence before them and the risks of different courses of action. *Webb*, 248 So. 3d at 776 (¶4) (stating that the trial judge's findings must be affirmed if "they are supported by substantial, credible, and reasonable evidence" (quoting *Lewis*, 153 So. 3d at 693 (¶4))). We cannot say that the trial judge's findings were "manifestly wrong" or "clearly erroneous" or that she applied an "erroneous legal standard." *Id.* (quoting *Lewis*, 153 So. 3d at 693 (¶4)). As the Supreme Court has explained, "[a]lthough reasonable minds might differ on the conclusion of whether or not the officer in question acted in reckless disregard, it is beyond this Court's power to disturb the findings of the trial judge if supported by substantial evidence." *Id.* at 777 (¶4) (quoting *Lewis*, 153 So. 3d at 693 (¶4)).[6]

¶46.    **AFFIRMED.**

**BARNES, C.J., CARLTON, P.J., GREENLEE, WESTBROOKS, McDONALD, LAWRENCE, McCARTY, SMITH AND EMFINGER, JJ., CONCUR.**

---

[6] As stated above, because we affirm the judgment of the trial court based on the MTCA's police-protection exemption, we need not address, and express no opinion on, the trial judge's rulings regarding the existence vel non of a legal duty and the MTCA's discretionary-function exemption.